```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3
    DOBBINS CHANG, LLC, d/b/a       )
 4  Fantasy Plaza,                  )
                                    )   NO. H-18-CV-299
 5           Plaintiff,             )
                                    )   February 28, 2018
 6  v.                              )
                                    )
 7  THE CITY OF HOUSTON, et al.,    )
                                    )
 8           Defendants.            )

 9

10                            HEARING
                 BEFORE THE HONORABLE LYNN N. HUGHES
11

12

13

14   For the Plaintiff:          Albert T. Van Huff
                                  Renee Nguyen
15                                Monshaugen & Van Huff, PC
                                  1225 N Loop West, Suite 640
16                                Houston, TX 77008

17   For Defendant               Nirja Aiyer
     City of Houston:            Damon A. Crenshaw
18                                City of Houston
                                  900 Bagby, 3rd Floor
19                                Houston, TX  77002

20   For Harris County,          Celena Vinson, ACA
     Texas, et al.:              Rosemarie Donnelly, ACA
21                                Harris County Attorney's Office
                                  1019 Congress, 15th Floor
22                                Houston, TX  77002

23   Court Reporter:             Bruce Slavin, RPR, CMR

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.
```

1          THE COURT:  Good morning.

2          MS. VINSON:  Good morning, Your Honor.

3          MS. AIYER:  Good morning.

4          THE COURT:  It might interest you all to know that

10:30   5   we can hear everything that happens in this courtroom even

6   if we're not here.

7               So, Mr. Van Huff, where are we?

8          MR. VAN HUFF:  We are -- Fantasy remains closed

9   under the state court temporary injunction.

10:30  10          THE COURT:  Speak up.

11          MR. VAN HUFF:  Fantasy remains closed under the

12  state court's temporary injunction.  We have a hearing set

13  for tomorrow at 1:30 on a motion to vacate which both the

14  City and County are opposed.

10:31  15               We are pretty close to cutting -- to working

16  something out with the City, but the County is in the way.

17  And the County has expressed that it's basically not bound

18  by the instructions of the Court that were given to the City

19  at the last hearing and that, as stated in a filing with the

10:31  20  state court, that this court's temporary restraining order

21  has no bearing on the state court temporary injunction.

22          THE COURT:  I don't know what "bearing" means.  I

23  made it perfectly clear at the hearing I wasn't telling that

24  judge what to undo or to do.  I did find that the evidence

10:31  25  that was offered to the state court was dishonestly

1   incomplete, and that's my problem.  It may be the state

2   court's problem, too, but that's something for her to

3   decide.

4              Miss Vinson, do you want to...?

10:32   5        MS. VINSON:  Judge -- thank you, Your Honor.

6        THE COURT:  Thank you for coming.

7        MS. VINSON:  Sure.  Of course.

8              You know, I disagree a little bit with what

9   Mr. Van Huff has said.

10:32   10             Out of respect for your opinion, we did offer

11   to modify our temporary injunction.

12             As you're aware, there were a couple of

13   licensure requirements that the judge ordered, that

14   Mr. Van Huff's client had to have an SOB license and the

10:32   15   dancers had to be licensed.  And in light of your ruling

16   saying they could be a part of the Sweet 16 agreement, we

17   presented to Mr. Van Huff a modification saying, 'Hey.  We

18   respect the Judge's opinion.  Obviously, that's inconsistent

19   with his ruling.  So, we will take those -- agree to

10:33   20   modify.'

21             He's asked us to nonsuit our case, Judge, and

22   we just can't do that.

23        THE COURT:  So, I'm not clear exactly which license

24   who needs.

10:33   25        MS. VINSON:  Okay.

```
 1              THE COURT:  I am clear the City and the County and

 2     the State spend an inordinate amount of time on this sort of

 3     thing.  If you want a list of potholes that need to be

 4     filled and county libraries that need books and other

 5     things, I'd be happy to supply that.

 6                   So, those licenses, are they city licenses or

 7     county licenses?

 8              MS. VINSON:  They would be city, Your Honor.

 9                   So, the temporary injunction ordered that

10     Mr. Van Huff's client -- since he wasn't part of the

11     agreement and he wasn't a licensed SOB, he was unregulated

12     completely.  So, we said -- it was our understanding he

13     didn't want to be a part of the agreement.  His original

14     petition to this court was that the agreement should be

15     nullified.  So, our position was, well, then you have to

16     comply with the SOB ordinance.  It has to be one or the

17     other.

18                   And, so, we asked the judge --

19              THE COURT:  That seems to be reasonable.

20              MS. VINSON:  So, we asked the judge, based on the

21     evidence presented to the court, Judge, a reasonable

22     requirement to eliminate and abate the prostitution and the

23     other crimes --

24              THE COURT:  Wait a minute.  The other "charges".

25              MS. VINSON:  Yes, Your Honor.
```

10:33

10:34

10:34

10:34

10:34

1          THE COURT:  It's unconscionable that you go destroy

2     people's businesses based on charges that have been

3     disavowed by the district attorney.  They really shouldn't

4     even be charges because they have been disavowed.

10:35   5          There are three charges:  the minor, a

6     shooting and --

7          MR. VAN HUFF:  Yes, sir.

8          THE COURT:  Wasn't there another one?

9          MR. VAN HUFF:  I looked into the prostitution cases

10:35  10    that had been brought --

11         THE COURT:  Oh.  The one where they pleaded guilty.

12         MR. VAN HUFF:  There have been a total of three in

13    the past four years.

14         THE COURT:  That pleaded guilty?

10:35  15         MR. VAN HUFF:  Yes, sir.

16         THE COURT:  All right.  Did the officers who went

17    to Fantasy Plaza those nights -- did they wear microphones?

18         MS. VINSON:  I believe there was recorded audio.

19    Yes, Your Honor.

10:35  20         THE COURT:  And has that been furnished to

21    Mr. Van Huff?

22         MS. VINSON:  I don't believe he's asked for it,

23    Judge, at this point.

24         THE COURT:  That's not my question.  My question is

10:36  25    not --

1          MS. VINSON:  I'm sorry, Judge.  I am getting

2    information about the discovery from everybody.

3               So, what I am told is that in criminal cases,

4    yes, they were produced to the defense attorneys.

10:36  5               And, Judge, I don't know how much you want to

6    hear from me about our version of the criminal activity that

7    happened at Fantasy.  It does differ from Mr. Van Huff's.

8          THE COURT:  All I want to know is -- The County

9    said that there have been 30 crimes out there.  It didn't

10:36  10   say 30 charges.

11              So, how many of the 30 crimes that the County

12   seems to be proud of are convictions?

13         MS. VINSON:  I understand, Judge.  Ms. Donnelly can

14   provide you with that.  I just -- There is one --

10:36  15         THE COURT:  Well, she can tell you.

16         MS. VINSON:  She certainly can.  And the reason --

17   Judge, we're not trying to misrepresent.  The reason we

18   consider some that aren't convictions is, for instance,

19   there is a girls court where prostitutes are victims of

10:37  20   trafficking.

21         THE COURT:  But --

22         MS. VINSON:  They're not convicted.  So, they make

23   an arrest -- Sorry.  Go ahead.

24         THE COURT:  But you charged somebody with

10:37  25   trafficking.

1    MS. VINSON:  Correct.

2    THE COURT:  You can't count her non-culpable

3  participation as a separate crime.  There is no crime.

4    MS. VINSON:  The information I have before me,

10:37  5  Judge, is during a six-month period in 2017, at the point

6  where the County decided we have got to intervene on this

7  case, there were six arrests for prostitution, which is --

8    THE COURT:  I want to know convictions.

9    MS. VINSON:  Okay.  One guilty plea, two were

10:37  10  offered dismissals, and two of them bond-forfeited.

11    So, you're correct, Judge.  There would be one

12  conviction, two went to diversion court and two never showed

13  up for court.

14    THE COURT:  Which is not a plea of guilty.

10:38  15    MS. VINSON:  Correct.  That's correct.

16    THE COURT:  It's just an awkward way to proceed.

17    And how long ago was the gunfight -- or the

18  last gunfight?

19    MS. VINSON:  March of 2017, Your Honor.

10:38  20    THE COURT:  If there's a gunfight in the pass-thru

21  alley of NRG Stadium in the parking lot, is the City going

22  to pay the victim of it for not policing it adequately?

23    MS. VINSON:  We like that analogy, Judge, because

24  NRG has tons of law enforcement.

10:38  25    THE COURT:  There are still shootings.

```
 1              MS. VINSON:  I understand.  But, really, our TI is
 2    just telling his client do the things NRG would do.  Have
 3    licensed peace officers.  Take these steps to safeguard the
 4    public.  And, so, we're not asking that --
 5              THE COURT:  It has to be proportionate.  How many
 6    people does NRG --
 7                  My point was it's county property.  Right?
 8              MS. VINSON:  Yes, Your Honor.  That's correct.
 9              THE COURT:  It has a chain-link fence around it.
10    It's a county parking lot.
11                  So, how many patrons will Fantasy Plaza seat?
12              MR. VAN HUFF:  Approximately 100 maximum.
13              THE COURT:  How many does NRG seat?
14              MS. VINSON:  Thousands upon thousands, Your Honor.
15    Maybe 30,000?  70,000?
16              THE COURT:  At least.
17              MS. VINSON:  I'm not very sports --
18              THE COURT:  Me neither.  That's why I am asking
19    you.
20              MS. VINSON:  It's a significant difference.
21              THE COURT:  That's the problem.  NRG can afford to
22    do more things because it has more patrons.  That was the
23    theory.  And, so, you wouldn't expect a convenience store to
24    have two police officers -- one at the gas stations and one
25    by where you buy the beer or whatever.  You couldn't run it
```

10:39 (line 5)
10:39 (line 10)
10:39 (line 15)
10:39 (line 20)
10:40 (line 25)

1    that way.

2                    It ought to help maintain the law, but both

3    the defendants here are law-enforcement-operating entities.

4    And where were the constables and the deputy sheriffs and

10:40    5    the police officers?

6             MS. VINSON:  Where were they with respect to

7    Fantasy?  I think the evidence was they put a lot of

8    resources and time into investigating the complaints.

9             THE COURT:  Well, but we're interested in

10:41   10    intervention here.  You're not mad at Fantasy because it

11    didn't investigate it.  You're mad at them because it

12    happened.

13                    Were the people patrons?

14             MS. VINSON:  Patrons and employees, Your Honor.

10:41   15             THE COURT:  That sort of makes it unrelated to the

16    business.  Employees go crazy.

17             MS. VINSON:  And, Judge, I understand that you

18    don't necessarily agree, but our position is that the whole

19    nature of this business is a nuisance, which is why the city

10:41   20    council adopted the SOB ordinance.

21             THE COURT:  How many have they adopted?

22             MS. VINSON:  That's a Ms. Aiyer question.

23             THE COURT:  At least they were two years maybe

24    close to election time.

10:42   25             MS. AIYER:  We have one ordinance, Your Honor --

| | | |
|---|---|---|
| | 1 | THE COURT:  I know, but you change it all the time. |
| | 2 | MS. AIYER:  Actually, Your Honor, the last time we |
| | 3 | changed it was 1997. |
| | 4 | THE COURT:  Are you sure about that? |
| 10:42 | 5 | MS. AIYER:  Yes, Your Honor. |
| | 6 | THE COURT:  NRG seats 72,000 people. |
| | 7 | MS. VINSON:  That's what Mr. Crenshaw was saying |
| | 8 | over here, in the 70s.  So, he's with us. |
| | 9 | THE COURT:  He's reading my mind. |
| 10:42 | 10 | That's a scary proposition for you. |
| | 11 | Well, they certainly debate it often enough. |
| | 12 | MS. AIYER:  It was challenged in this court or Your |
| | 13 | Honor's court, in the federal court, for ten years plus. |
| | 14 | Yes, Your Honor. |
| 10:42 | 15 | THE COURT:  Is that the one where Judge Atlas |
| | 16 | eliminated the completely vicious thing that they had -- the |
| | 17 | girls had to wear their own dress and...? |
| | 18 | MS. VINSON:  Yes.  Judge Atlas upheld the ordinance |
| | 19 | and was -- |
| 10:43 | 20 | THE COURT:  I have a hard time imaging a meaner |
| | 21 | thing than the city actually going and adopting a rule that |
| | 22 | was intended to discourage girls from dancing because it |
| | 23 | made them more vulnerable to the stuff the city is supposed |
| | 24 | to stop. |
| 10:43 | 25 | And I love Houston.  It's been very good to |

1     me.  It's a great place.  But none of us is perfect.

2              All right.  Mr. Van Huff, what is Dobbins

3     Chang going to do?

4              MR. VAN HUFF:  Dobbins Chang would like to enter

10:44   5     into a settlement agreement that's already been proposed by

6     the City, and in consideration of that Dobbins Chang is

7     going to dismiss the federal court action against both the

8     City and the County on the condition that the County nonsuit

9     its intervention in the state court case.

10:44  10              THE COURT:  Will that work?

11              MS. VINSON:  Judge, I am afraid, no, it won't.  I

12     mean, he's asking us to dismiss and nonsuit our entire case,

13     and we believe we have a valid state law claim against them

14     under the Civil Practice and Remedies Code.

10:44  15              THE COURT:  Wait a minute.  You muttered that.  You

16     spoke a footnote there and I couldn't understand it.

17              MS. VINSON:  Oh.  We believe that we have a valid

18     state law claim against them under the Texas Civil Practice

19     and Remedies Code not associated at all with the SOB

10:44  20     ordinance.

21              Judge, we shouldn't be a part of this federal

22     lawsuit.

23              THE COURT:  Wait a minute.  What is your claim?

24              MS. VINSON:  That they operate as a nuisance.

10:45  25              THE COURT:  Based on it being sexually oriented.

1       MS. VINSON:  No, Your Honor.  Based on the crime.

2             We just filed another lawsuit against the

3    Sweet 16 Club because of the crime, the incident reports,

4    the reputation.  All of that goes into being a danger to the

10:45   5    community.  And all we ask that they do is take steps to

6    reduce it.

7             THE COURT:  What steps?

8             MS. VINSON:  Hire law enforcement, close at a

9    particular hour, abide by city --

10:45  10             THE COURT:  Why do they have to close?

11             MS. VINSON:  Well, because, Judge, these clubs

12    typically operate all night and there are statistics that

13    show that crime goes up in the middle of the night.  You

14    have drunk drivers.  You have robberies, assaults.  If

10:45  15    you're operating a club at 3:00 in the morning and they're

16    BYOB, law enforcement is going to have to keep going back to

17    the same locations over and over and people are injured.

18             THE COURT:  How many people are open at three

19    o'clock in the morning?  Okay.  Well, that's fine.  But

10:46  20    Denny's and a bar probably has more police calls regardless

21    of the time it's open.  But three o'clock in the morning...

22             MS. AIYER:  Judge, if I may, our problem with --

23    and I think Mr. Van Huff just said it himself.  He basically

24    threatened the County and the State of Texas that, if we

10:46  25    didn't nonsuit our state law claim, he was going to bring us

1    into federal court --

2            THE COURT:  Well, he lived up to his policy

3    statement and, so, maybe you ought to listen more carefully

4    next time.

10:46   5            MS. VINSON:  My only issue, Judge --

6            THE COURT:  I hope the next time it doesn't involve

7    me.

8            MS. VINSON:  Me, too, Your Honor.

9                 The only issue, Judge, is we have nothing to

10:46   10   do with the Sweet 16 agreement.  His federal law claim is

11   that that agreement violates his client's constitutional

12   rights.  The County is not a party to it.

13           THE COURT:  Actually, his exclusion from it.

14           MS. VINSON:  Correct.  But it's all about the

10:47   15   Sweet 16 Club which involves the City.  It has nothing to do

16   with the County.  We have nothing to do with that agreement.

17   There is no basis in fact or law for him to have included us

18   in this lawsuit other than to try to intimidate us and

19   threaten us.

10:47   20           THE COURT:  Poor baby.

21           MS. VINSON:  Yeah.  Right.  It's not the first

22   time.  You're exactly right.

23           THE COURT:  Much less Judge Emmett, the four

24   commissioners, all those.  Somehow -- And you all have been

10:47   25   sued by --

1          MS. VINSON:  That's true.

2          THE COURT:  I have no idea how many suits you get a

3     year, but it's a bunch.

4          MS. VINSON:  Well, he sued Ms. Donnelly

10:47   5     individually.  That's the lawyer for the state's case.

6     There's no reason.  It's just absurd and it's unfortunate we

7     have gotten into this.  We think we have made a reasonable

8     offer.

9          THE COURT:  Wait a minute.  What did you do?

10:48  10          MS. DONNELLY:  Your Honor, Rosemarie Donnelly, and

11     I am the attorney of record for the state court lawsuit.

12     That's why I have been sued in federal court by Mr. Van

13     Huff's client.

14          THE COURT:  You got a good lawyer.

10:48  15          MS. DONNELLY:  I do have a good lawyer.  I am very

16     grateful to her for appearing here.

17          THE COURT:  I am glad you were tracking her down.

18          MS. DONNELLY:  And we were able to track her down.

19          THE COURT:  All right.

10:48  20          MS. DONNELLY:  If I may, Judge, I mean, just to Ms.

21     Vinson's point.

22               We represent the State of Texas in nuisance

23     lawsuits in state court -- the State of Texas, Harris

24     County, Rosemarie Donnelly.  We don't have anything to do

10:48  25     with the Sweet 16 agreement.  We don't decide who gets to be

1   a part of the Sweet 16.  We don't get to decide who doesn't.

2   We simply enforce nuisance lawsuits --

3          THE COURT:  Erratically and selectively.

4          MS. DONNELLY:  -- where the crime is, where the

10:48   5   history of the crime is, where the evidence is.  If we think

6   we can prove our case, that's our only criteria.  We don't

7   make a distinction between Sweet 16 or non-Sweet 16.  In

8   fact, we just sued a Sweet 16 agreement club a couple weeks

9   ago.  We don't make that distinction.  That's the city.  We

10:49   10   are separate from that.

11          There is no basis for Mr. Van Huff's client to

12   have sued us in federal court, because, as I understand his

13   federal court lawsuit, it is solely based upon his client's

14   exclusion from the Sweet 16 agreement.  We don't have

10:49   15   anything to do with that.

16          THE COURT:  Not with the agreement but selective

17   enforcement in aid of the agreement.  The county might

18   defend some principles.

19          MS. DONNELLY:  In light of the Court's -- as

10:49   20   Ms. Vinson said, in light of the Court's opinion, we did

21   read it, we understand it, and we decided that we would

22   offer Mr. Van Huff's client to remove the SOB reg

23   requirements from the court's temporary injunction.  We

24   offered that.  It was refused by Mr. Van Huff's client.

10:49   25          The only thing Mr. Van Huff's client will be

1    satisfied with is we nonsuit our case; and, frankly, we're

2    just not willing to do that because we believe that this

3    location is, in fact, a nuisance and we want to complete our

4    case in state court and have the state court rule on the

10:50    5    remedies that we're entitled to under the evidence.

6        THE COURT:  The standard certainly -- And I did

7    nuisance cases as a state judge.  Here, I've done two kinds

8    of nuisance cases.  One is about nuisances and ones that are

9    nuisances.

10:50    10        MS. DONNELLY:  Judge, if I may.  Mr. Van Huff's

11    client has also filed a notice of appeal in the Houston

12    First Court of Appeals of the state court temporary

13    injunction.  That court can hear all of Mr. Van Huff's

14    client's complaints about temporary injunction; and we don't

10:50    15    think that it's appropriate for him to circumvent the Court

16    of Appeals job, which is to grade the papers of the district

17    court and decide if the temporary injunction was entered

18    properly or not.  We think we have been --

19        THE COURT:  Actually, I'm not going to do it.

10:51    20        MS. DONNELLY:  We think we have been dragged into

21    federal court because Mr. Van Huff wants to cram down the

22    settlement he wants, and we're simply not willing to do

23    that.

24        We have provisions within the temporary

10:51    25    injunction that the state court ruled upon.  She heard the

1    evidence and she decided that these provisions were

2    reasonable.

3         THE COURT:  I don't know that there was full

4    disclosure.  All I know about that case is what you all told

10:51  5    me and what was in the papers.

6         MS. DONNELLY:  Understood, Your Honor.  He had a

7    full afternoon of the hearing.  There was two witnesses --

8    excuse me -- three witnesses that testified --

9         THE COURT:  That's fine.  I said before I am not

10:51  10   interfering.  I have been maybe a collateral nuisance, but I

11   am not going to directly interfere.

12         Why couldn't it remain open with some safety

13   precautions until all this gets worked out?

14         MS. DONNELLY:  That's our view, Judge, and we have

10:52  15   that in the temporary injunction of the state court.  The

16   judge entered the safety precautions that the Court just

17   mentioned.  Mr. Van Huff wants essentially --

18         MS. VINSON:  Excuse me, Ms. Donnelly.

19         Judge, that's our offer, that they could stay

10:52  20   open with some safety measures.  So, I think that's what the

21   Judge is just referring to.

22         THE COURT:  It's not Mr. Van Huff.  It's Mr. Chang.

23         MS. VINSON:  Well, true.  And that's a good point,

24   Judge.

10:52  25         THE COURT:  I am not going to hold you personally

1    responsible for the County.

2              MS. VINSON:  Thank you.

3              MS. DONNELLY:  Thank you, Judge.  Appreciate that.

4              MS. VINSON:  Mr. Chang is not, as you know,

10:52    5    Judge -- I think this came up last time -- that he's not

6    even a party to the TI.  So, it's a real weird situation

7    we're in because the plaintiff in your court is not even

8    subject to the temporary injunction in the state court.

9              THE COURT:  Who is the object?

10:53   10              MS. AIYER:  That would be the landlord, which is --

11    What's the name of the corporation?

12              MS. DONNELLY:  Acres Homes.

13              MS. VINSON:  -- Acres homes.  So, it's not even

14    Mr. Van Huff's client Dobbins Chang who brought this case.

10:53   15              THE COURT:  Of course, he obviously --

16              MS. AIYER:  -- impacted.

17              THE COURT:  Worse than that.  It's about what Chang

18    is doing.

19              MS. VINSON:  That's correct, judge.  And what Acres

10:53   20    Homes isn't doing because, as you know -- obviously this

21    case is in state court -- one of our best avenues is to go

22    after the landlord and say, 'You can't turn a blind eye,

23    landlord, to the habitual crime on your property.'  So, he's

24    kind of on the hook, too.

10:53   25              THE COURT:  Which may be wrong.  What you're doing

1   is making people with business relations with others to

2   insure their good conduct; and I don't think that would

3   stand up criminally, but...

4          MS. AIYER:  I understand, Judge.  And we negotiate

10:54   5   with a lot of them.  We don't sue all the landlords who have

6   issues on their property.  We absolutely agree with that.

7   Some of them go, 'I had no idea.  I am going to take steps.'

8   But this isn't the case in this situation.  They were under

9   a lawsuit for two years and nothing changed and it didn't

10:54   10   get better.

11          MS. DONNELLY:  In fact, that's why we intervened in

12   the case, Judge, because the prostitution that we spoke of

13   in 2017, this was after they were already sued by the City.

14   So, nothing had changed.  Nothing had improved and, in fact,

10:54   15   it was worse.

16          THE COURT:  You know, in 1910 prostitution was

17   legal in Waco and it was as Baptist then as it is now, but

18   there was a rash of...

19              Using the government to enforce one's beliefs,

10:55   20   which may not be constructive for public health -- For

21   instance, when the Chicken Ranch closed the rate of venereal

22   disease in Fayette County just jumped way up because the

23   girls had to have a medical exam every two weeks.  It

24   functioned fine until this reporter here in Houston decided

10:55   25   to make a story.  There are problems associated with

         1   prostitution, like drinking, but the regulations need to be

         2   constructive and not putative; otherwise, you just make the

         3   problem worse.

         4            Make the alcohol restrictions really tight

10:56    5   like prohibition, say, for 13 years.  All we did was

         6   capitalize the mob and have a whole lot of smuggling.

         7            There are lots of things.  Cities decide

         8   they're going to put a five-dollar-a-pack tax on cigarettes.

         9   Their revenue goes down.  People drive out of town to get

10:56   10   them.  Bootleggers in town.

        11            Being disgusted by something is not a

        12   solution.

        13            Mr. Van Huff, I don't know what I can do.  The

        14   consortium that the City is running will let you in provided

10:57   15   you do a couple of things that don't seem unreasonable.

        16            I don't think you know whether anybody else

        17   has lesser so-called security than what they're asking for.

        18   If Treasures or Baby-O's or something has no officers there,

        19   they may be different, but then, of course, if they don't

10:57   20   have -- and I am going to narrow it down to police calls --

        21   at a high rate, there may be no need to have officers.  My

        22   guess is there are fewer robberies at the Four Seasons than

        23   there are at the No Tell Motel on Airline.  They're not

        24   really a motel; it's the nature of the clientele.

10:58   25            MR. VAN HUFF:  One of the issues that we have --

1   and I have seen this in the past with regard to requirements

2   of police officers -- is that there are certain types of

3   businesses they're not permitted to work and that includes

4   gentlemen's clubs and also businesses that stay open past

10:58   5   two o'clock, which Fantasy does a few days a week.

6         THE COURT:  Well, then, get a private security

7   guard from a firm -- Private security places vary more than

8   police officers do.  We'll put in "reputable" and

9   "rigorous"...

10:58   10        MR. VAN HUFF:  We already have that.

11              One thing that I would like to point out to

12   the Court is that the agreement that we're looking at with

13   the City has many, many restrictions on the manner of

14   operation of the club.  It requires increased lighting,

10:59   15   increased visibility inside the club.  It requires human

16   trafficking abatement training for the club's employees,

17   background checks.  There is conditions associated with the

18   background check such as --

19        THE COURT:  Background checks on whom?

10:59   20        MR. VAN HUFF:  On the dancers such that if the

21   background check reveals that a dancer has had a prior

22   prostitution conviction she's not allowed to work at the

23   business.

24              So, there are many restrictions in the

10:59   25   agreement that we hammered out with the City, but the County

1    won't let go of its TI, and I don't think they're entitled

2    to a TI.

3              We're having a hearing on the motion to vacate

4    tomorrow in state court where, hopefully, the City will

10:59  5    follow this court's instructions and advise the state court

6    of the issues that they have had with this original

7    application for temporary injunction.  I don't think they're

8    entitled to a temporary --

9              THE COURT:  Well, why don't you tell them if the

11:00  10    City doesn't?

11              MR. VAN HUFF:  I plan to.

12              THE COURT:  Give them some real facts.

13              MR. VAN HUFF:  One of the issues --

14              THE COURT:  If 30 crimes turns out to be rather

11:00  15    somewhat different...

16              MR. VAN HUFF:  One of the issues we had:  The

17    County and the City objected to all of my dismissal

18    paperwork.  And then the state court judge didn't let me put

19    on any evidence at all.  It went straight from their case to

11:00  20    closing and then rendered a decision in their favor.  So, we

21    really got the railroad in state court.

22              MS. VINSON:  Judge, as he pointed out, we have a

23    hearing tomorrow.  And this stuff about the police officer,

24    not being able to hire one, he's never told us that.  These

11:00  25    are things that we can work on potentially, but these are

```
 1    things for the state court and for modification,

 2    potentially.

 3         THE COURT:  No.  If you all work it out, it's not

 4    for either one of us.

 5         MS. VINSON:  Exactly.

 6         THE COURT:  I believe I speak for both of us, that

 7    that would be all right.

 8         MS. VINSON:  It's just a temporary order for 90

 9    days until trial.  So, I mean, this is why --

10         THE COURT:  If you close the business for 90 days

11    you've closed it.

12         MS. VINSON:  Our modification would allow them to

13    open back up.  He doesn't want to agree to that.

14         THE COURT:  Well, I'm no broker.  I am just

15    suggesting.

16         MS. VINSON:  I know.  I understand.

17         THE COURT:  My case does not require emergency

18    relief, because in the absence of some likelihood of its

19    opening, there is no current -- if you get rid of this, it

20    could or could not want to join the agreement and the City

21    may or may not have a complaint.  But that can be worked

22    out.

23              And if the City offers a place in the cartel

24    on terms that may be different but no more strenuous than

25    they offer the other 21 members, well, then, that equal
```

11:01    5

11:01    10

11:01    15

11:02    20

11:03    25

1   protection and anti-trust thing seems to go away.

2           But at the moment -- Does he have a written

3   proposal?

4           MR. CRENSHAW:  Yes, Your Honor.  We went back and

11:03   5   forth --

6           THE COURT:  Good.

7           MR. CRENSHAW:  -- with more than one writing, but

8   we went back and forth.  I thought we had reached an

9   agreement in concept on Friday, and it was put in writing

11:03   10   and sent Friday.

11           THE COURT:  When you think you have got a concept

12   get it in writing immediately.

13           I spent three, four days mediating a case.

14   They agreed I could do it.  And, so, I finally worked out a

11:04   15   deal.  I wrote the outline of the deal and they said, well,

16   they would go back over it just across the street to flesh

17   it out.  45 minutes later they're back to fighting about

18   Round 1.  It was worth a try.  I did get them so they went

19   back to doing business with each other and left all the

11:04   20   unresolved things for six months.  And they're still doing

21   that, but they have now gone back and talked about they want

22   a better future and a less debt-ridden past.

23           You have got their Friday afternoon draft?

24           MR. VAN HUFF:  Yes, sir.

11:05   25           THE COURT:  You can do whatever you want to with

1   it.  I'm not going to make you sign it.  But I just need to

2   treat this like a case that needs prompt but not emergency

3   attention.

4                So, I would like to be formally notified of

11:05   5   any changes in the parallel cases.  The newspaper doesn't

6   always get some of the finer details right; and, so, I just

7   would like to know what y'all are doing to each other.  If

8   it's a major -- I don't want your squabbling.  If there's a

9   revised ruling or anything that would help me know what to

11:06   10   do or not to do with this in the meantime...

11            MS. AIYER:  Absolutely, Your Honor.

12            THE COURT:  Anything else we can do this morning?

13            MR. VAN HUFF:  Sir, does the temporary restraining

14   order that this court entered a few weeks ago -- does that

11:06   15   expire on the 14th day after --

16            THE COURT:  Whatever the rule is.

17            MR. VAN HUFF:  I believe that is the rule.

18            THE COURT:  Well, no.  I'm not worried about the

19   rule.  I have done a lot in the last couple of weeks besides

11:07   20   read the newspaper about your case.  So, I want to refresh

21   my recollection of what's in the order before I say it's a

22   nullity.

23                Yes, sir.

24            MR. CRENSHAW:  As I understand it, Your Honor, it

11:07   25   does expire.  However, the City continues to abide by that

1    order in that we offered the settlement agreement to treat

2    the Plaintiffs as if they were part of the settlement

3    agreement as ordered by the Court.  So, even so, even though

4    it's expired, we're still doing that.

11:07    5            THE COURT:  Thank you.

6                    And if you say "police officers" you ought to

7    change that to "licensed private security" or...

8            MS. AIYER:  I think, just for some clarification,

9    Your Honor, I can only speak as to the Houston Police

11:08    10   Department.  And the way it works is they find a police

11   officer and that officer then has to get permission to work

12   there.  And that may be the case, that they don't work

13   certain unlicensed locations; but that certainly does not

14   apply to all the other law enforcement, whether it's

11:08    15   constable, University of Houston Police, Huntsville Police,

16   any other county.

17           THE COURT:  HISD.

18           MS. AIYER:  HISD police.

19           THE COURT:  Metro police.

11:08    20           MS. AIYER:  That would be correct, Your Honor.

21   Certainly no indication there.

22           THE COURT:  Eastbound street police.

23                   Well, I simply don't know.  I am aware of all

24   those folks.  But the object is to get security there.

11:09    25           MS. AIYER:  That would be one.

1          THE COURT:  And I understand that a deputy sheriff

2     is scarier than somebody from Brinks, but that's not our

3     goal here.

4               Well, if they keep following that, there's no

11:09   5     need to extend it.  If they stop, then we'll discuss it.

6               I suggest that private security officers be

7     allowed in lieu of police.  My guess is they're also less

8     expensive.

9          MS. VINSON:  I think also -- and Mr. Van Huff

11:10  10     alluded to that -- they had private security while all this

11     was going on.

12          THE COURT:  Don't hire that one.  I don't know who

13     they have hired.

14               Mr. Chang has to solve the problem.  You know,

11:10  15     with cheap private security, you get what you pay for.  And,

16     so, I don't mind him wanting to use private people rather

17     than police officers, both for the intimidation effect and

18     the cost, but it has to be somebody who is going to do their

19     job, not look at their cell phone all night and things like

11:11  20     that.  That's the only change I would suggest.

21               And, as far as I am concerned, you can approve

22     the private security, tell them who it's going to be, what

23     hours and all that stuff.  Reasonable.

24               Anything else?

11:11  25          MS. VINSON:  Nothing from the State, Your Honor --

1    County that is.

2         MR. VAN HUFF:  Nothing else, Judge.

3         THE COURT:  I am probably going to wait a couple of

4    weeks, see where you are and then come up with a plan.

11:11    5         Do we need her because she's the person

6    executing the County's --

7         MR. VAN HUFF:  In researching Section 1983

8    claims --

9         THE COURT:  Well, I can't enjoin the County.  I can

11:12    10   enjoin the county judge.  That's what's called a really

11   complicated way of getting around a stupid decision that

12   says, 'Couldn't you do it, county?'  That's my summary.

13   *Hanes v. Louisiana.*

14        MR. VAN HUFF:  Yes, sir.  I will replace

11:12    15   Ms. Donnelly with the Harris County --

16        THE COURT:  No.  Then the county would have a

17   constitutional objection and they can't be enjoined and all

18   that sort of thing.

19        MR. VAN HUFF:  Well, the only reason why

11:12    20   Ms. Donnelly has been is because there's a rule that you

21   can't sue the state for violating 1983.  And the County sued

22   us in the state court on behalf of the State of Texas.  So,

23   if I don't list the official that I think was violating my

24   client's protected rights --

11:12    25        THE COURT:  That's all right.  I can understand

1   that.  I think you need a warm body, but it should be made

2   clear in your papers that it's ex officio and not in

3   personam proprietor.  I wasn't good at that.

4          MS. VINSON:  Law school days.  You're taking me

11:13  5   back to law school.

6          THE COURT:  Middle school for me.  Short experience

7   with Latin.

8          MR. VAN HUFF:  I will comply with whatever you

9   suggest.

11:13  10          THE COURT:  No.  I want it clear that your client

11   has no complaint with her except official.

12          MR. VAN HUFF:  Yes, sir.

13          THE COURT:  You can substitute the county judge.

14          MS. VINSON:  We'll tell him you suggested that,

11:14  15   Judge.  But you're right, I mean, obviously.

16          THE COURT:  She's here so she can be the conduit.

17   Enabler.

18          MS. DONNELLY:  Employee, basically, Judge.  At-will

19   employee, Judge.

11:14  20          THE COURT:  It's certainly not your fault that the

21   Supreme Court has lacked the character to forthrightly do --

22   The idea of sovereign immunity in America for any branch of

23   government is a contradiction.  The whole idea was that

24   nobody is sovereign, not even the people, because we had to

11:14  25   get together in different groups to make our decisions.  And

1    the case -- I forget the justice -- he was old but a pretty

2    good justice -- says, 'Well, we know the Eleventh Amendment

3    doesn't say that, but we always knew we meant it.'  On its

4    face, the precedent is simply, 'We did it and we think we

11:15   5    can get away with it.'

6              When Justice Breyer got on the court he wrote

7    this beautiful analysis of how misguided, expensive, crazy

8    and unconstitutional that was and then says, 'But it's stare

9    decisis; so, we'll follow it.'

11:16   10              (Off-the-record commentary)

11         THE COURT:  All right.  In an emergency -- it's

12   unlikely, but I don't want to entice anybody -- keep me

13   posted.

14         MS. DONNELLY:  We'll do that, Judge.

11:16   15         THE COURT:  All right?  Thank you, counsel.  And

16   thank you all again for coming promptly.

17         MS. DONNELLY:  Thank you, Your Honor.

18         MS. VINSON:  Thank you, Your Honor.

19              COURT REPORTER'S CERTIFICATE

20         I, BRUCE SLAVIN, certify that the foregoing is a

21   correct transcript from the record of proceedings in the

22   above entitled matter, to the best of my ability.

23

24                              *s/Bruce Slavin*
                               BRUCE SLAVIN, RPR, CMR

25